Good morning. It's nice to have an in-person argument here, and nice to see all of you. We have business this morning, big day, to hear five appeals this morning. After we hear the third case, the court will take a brief recess, and then we'll come back to hear the last two cases. Counsel, we're familiar with your cases, the authorities cited in your briefs, at least portions of the record that you have limited time this morning. So you should feel free to go straight to the heart of your argument. Be mindful of the clock. When the red light shines, it's time to stop. If you're answering a question from the court, of course, you can finish answering. If you're worried about time, if that applies to you, don't worry. If you're answering a question from us, you're on our time, so you won't be losing any of that. Our first case this morning, we'll hear in person. In the second case, we're going to have attorneys arguing here in the courtroom by Zoom. We'll have a little bit of a delay to make sure that we can see and hear them, and they can see and hear us, while IT makes that happen. Our first case is United States v. Maria. Ms. McShannon, will you come forward and speak with us? Okay. I'm sorry. That's not what my motion is, or my document is reflecting. That's all right. We'll hear in person. May I proceed? Yes. Good morning, Your Honors. I may have lost the court. My name is Kristin Bovane, and I represent the appellate, Maitland Hardwick, in this case. I'd like to reserve two minutes for rebuttal. Subject to the court's questions today, I will focus primarily on the trial with court's care, excluding Vida v. 404B evidence, that basically, someone else committed this crime, apart from David Hardwick. That scheme was that acting alone, Asha Maria, embezzled from a total of six different companies, carried off the scene by making the companies more profitable, and ultimately funneled benefits to unwitting third parties. Excluding this evidence prevented Mr. Hardwick from completely defending himself in time, and I ask this court to reverse Mr. Hardwick's convictions on all accounts. The trial with court's care was excluded. I'm going to need to go through two pieces of evidence. But first, several defense witnesses who would testify as to the details of the very distinct nature of Asha Maria's scheme. Second, the district court excluded this evidence as cumulative, right? There were witnesses who testified about the crookedness of this employee right, and district court didn't want to have, basically, a mini-trial about that. Why was that an abuse of discretion? Well, there were... If I can back up, I want to answer the court's question. Sure, go ahead. First of all, the trial court never specifically said it was cumulative, although your Honor is correctly quoting from the transcript. We believe the trial court said twice, we're not going to have a trial about Asha, was what the court's making. But the court initially said one witness had come in, then two. But this, in our process the day before, it just told the trial court the importance of the evidence. The trial court had ruled on the importance of the evidence and agreed it was admissible. And it noted that there were four witnesses from two different companies that the defense wanted to call. The court got that in half. As well as the initial problem, the FBI had to refer to the other three teams to get a place appointment for Asha Maria who had worked at the time. And then the next day the trial court said, I've decided it's only one. And initially she said, or then ultimately saying she would allow two. So, and I think I'll cut straight to this, but I do want to also mention there was also a tape of Asha Maria's own words that was also excluded. This is a tape that the defense was offering where she was perpetuating her scheme and continuing to lie to her boss. As well as the third piece of evidence was the final words of Joe Davenport, who was her lover and arguably one good beneficiary of other good events. Mr. Davenport had worked with her at two prior meetings as well as Marsha Arbenstein. So getting to the court's point, there were some witnesses that were involved, two specifically. So there were two of the five schemes the defense was able to talk about. But the problem is, the court noted, this is a signature scheme. It's coming in evidence not to show her capability that she's able to commit this crime, but the distinct scheme and practice for the way that she does it. That was vitally important to the defense because our big partner was Mr. Harwood as well as some of the other partners were beneficiaries of this scheme. In fact, there was testimony that the law was much greater than she actually gained because you're realizing I lose all votes. Why aren't two examples enough to show a pattern that you're suggesting? Thank you, Your Honor. By definition, a signature needs more than just one or two. I mean, the mark of Zorro does become the mark of Zorro because it happens at all times. We had examples five different times that we needed to get the evidence, as well as this is a simple robbery where we're trying to call all five clerks to come in and identify her. And although the defense, excuse me, the government certainly does that, the defense is trying to show how it is possible that Mr. Harwood is deceived like so many others. And so the folks, the two other ones that were excluded were imperative. They also knew Auctioneer. They worked closely with Auctioneer. They were totally deceived by the scheme and received things from it. We got one here and we got one there, but it didn't give the complete and the full picture. Some of them had information about Auctioneer blaming someone else and feeling intimidated by someone else, which were all ultimately just lies. And the same lies that she told with respect to Morris Harvey Schneider with Mr. Harwood. And there are specific facts that the other witnesses, the excluded witnesses, would have testified to because I didn't see in your brief really anything that identifies what those facts would have been that were not brought to the attention of the jury about the scheme. The signature scheme. Sorry. That's okay. Specifically, the FBI agents would have been able to testify to the other three schemes. There was one sex offerer person in Procure. This is filler. It's important because it shows Auctioneer that she's getting better. She's evolving. So by the time she hits her fifth scheme, which is Morris Harvey Schneider, she knows what she's doing. And the two specific witnesses that were excluded, Ern Johnson was a proffer. That was a witness who said that at 12, you're going to have to leave. And the proffer went into more detail. Ms. Johnson knew Auctioneer much longer than the original witness we called. He noted, I think, in our proffer that he knew her like a daughter. She was someone that he was incredibly close with. He was the higher-up and manager more. He had more details about exactly what she said and the blames that she put on other people. Tara Bridge was the other person from Procure that we were not at all. She had some of the information that the original witness had testified to, which in theory they all had the same information. In theory, it's always going to be the same scheme. But she was important because she had more details about what Auctioneer had done. It seems relevant to me that this evidence would be relevant only to the fraud claim, not to the claim of a false statement to the bank. And it seems to me that the evidence is almost overwhelming with respect to the fraud claim and that that is relevant in deciding whether this is an abuse of discretion and error. With respect to your Honor, I would argue it's something important to look at. Holmes v. South Carolina Justice Lito addressed it exactly. It's a poor recall of Holmes v. South Carolina. South Carolina had a rule barring defense from essentially putting up evidence that someone else had done the crime. But the problem, as they had said, that if it could be barred, and one of the logical reasons for looking at that was that if you brought evidence, it was overwhelming. Holmes v. South Carolina Justice typically said no. That's not the rule and we're advocating for that. That is not a proper logistical manner for determining whether or not it is any true his or her innocence that someone else had committed the crime. This is why it was vital to us. But in Holmes, was there other evidence that was allowed in that someone else had committed the crime? No, there was no other evidence that was allowed in. I don't think so. So that's a pretty important difference between Holmes and this case, right? Yes, that is one difference. However, it's different since we were offering it to show the pattern of sustain. The reason why it was admissible was not to show that she had committed another crime before, but it was to show that she had a pattern. The witnesses who were allowed showed her signature with respect to each of those two former employers, right? Your Honor, they showed a piece of it. It shows that each of them had been duped by her, right? It showed that both of them had been duped by her. And the other witnesses would just be about those two former employers, right? Not the FBI, actually. But yes, the other two witnesses would go into further detail of the scheme. But that's why it's important in Holmes v. Hall. As Toledo said, it's not just defense. It is a complete defense. And what better evidence do we, the defense, have than the full story of exactly what she did as well as the second hearing that I narrated? Was that she wrote her own words. Her own words. The jury didn't even get to hear them, but we couldn't cross examine her in Fortis Square. So they didn't even get to hear her statements, as well as the fine words of Joe Davenport, who worked with her, received benefits, and who said he had no idea that she was stealing from previous employers. And I'm sorry, Your Honors, I see that my time is up. Unless you have any other questions. No, you still have a couple minutes for rebuttals. Thank you. I now notice that actually Ms. Geddes did write in red letters that you should have gone first. It's early in the morning. I'm still on central time. Mr. Chairman. May it please the Court. My name is Jeff Tannen, and I represent Scott Kamari. I have three total minutes today, and I'd like to reserve one of those minutes for rebuttal. So it seems to me, though, to cut down the chase, you've got a pretty clear ex post facto violation here that you've raised. The Governor concedes it, and therefore you're entitled to a vacater and remand for resentencing. Am I missing anything? I don't think you're missing anything, Your Honor. I'd like to briefly discuss the proper scope of the proceeding. So, I mean, as to her custodial sentence, Ms. Kamari, our position is that Ms. Kamari should be resented specifically under the total as of 18, and the guidelines range from 27 to 39 months. So I'm just talking about the nature of a vacater, a general person specifically. Well, if it was a mistake to use the new guidelines manual, and the District Court needs to use the earlier one, what would we say other than that? I think... So all of the issues underlying Ms. Kamari's sentencing range under the earlier guidelines have already been decided by the District Court, because those issues are the same issues that the Court decided to expect under the 2018 guidelines. So what I mean by that is that all of the components of Ms. Kamari's sentencing range, other than the same financial charge enhancement, are the same under the 2013 guidelines, and the 2018 guidelines, all of them have been pulled on by the District Court, and neither side has a deal with any of those issues. So, for purposes of issue, there's anonymity, finality, and fairness. They think that a limited management is warranted here. Okay. Any questions? Thank you, Mr. Chairman. Thank you. Okay. Ms. O'Hara? Is that what I said? Or O'Hara? What? Ms. O'Hara. Oh, O'Hara, you said. O'Hara. Yes. Oh, okay. Reporters report, my name is Rebecca O'Hara, and I represent the United States in this matter. At this time, I'd like to say that Mr. Russell Phillips is the United States Attorney who prosecuted the case below. Regarding the 401k issues, in this case, the report did not abuse the discretion or partially limit the 401k evidence that came to trial. And indeed, the complaint of evidence that was excluded all dealt with. This theory, Mr. Hardwick wanted to present at trial about Mrs. Moira and her ability to defraud her employers and lie to her employers. And that's exactly the defense Mr. Hardwick presented to the jury. He did it openly. He did it in closing. He did it in reverse for abuses. And he also pointed to that theory in his own testimony, as well as the cross-examination of government witnesses about their trust in Mrs. Moira and their ignorance in defrauding her firm. So, Mr. Hardwick wasn't defrauded, but he did not commit offenses. The court acted as if he already had managed a trial and looked at that evidence. To avoid a new trial, he did not shoot Moira. What about the suicide note? So, when it comes to the suicide note, the one thing the defense points to is the trial order that did exclude that suicide note. But one thing they didn't mention were the other reasons that it was excluded. In the latest document 22-7, where the court excluded the note, it states not only that it was excluding the note because there's evidence that Mr. Moira lied, but also that the note did not fit into the court order. The note did not fall into any of the jury's statements. The court said that the judge was not convinced of the statement because there was no guarantee of trustworthiness as a document in relation to the court's statement. Moreover, the court noted in that order that there were concerns about the authenticity of the note. None of either one of those two points are addressed by the defense when they are in their work, and they don't raise it when there are errors on this report, which is put on the cases. Looking at the records also shows there were points made about witnesses. The court did not follow the defense witnesses were bringing. And to be clear, there were witnesses in the defense witnesses that they wanted to bring to the defense and to Mr. Moira. What about the FBI agent? So when it comes to the FBI agent, there's no mention of the FBI agent in the defense briefs, and the court did not look at that. However, that being said, on pages 235-38 of the record, it was where the FBI agent was mentioned, and the only mention of it is to say, we may bring the FBI agent to talk about things lying to Mr. Moira, and lying to the defrauding former employers. The defense never presented that agent to the FBI, and there was no order for the defense to support the controversy review. Okay. Also of note, the defense never complied with any tuition requirements. Showing that the defense can't even believe there's no good value in this character. Excuse me. No. Do you have any quarrel with what Mr. Chen said about scope over man? No, Your Honor. The, we believe it was official for the torturing and manslaughter instructions for the tort to apply. The 2013 guidelines manual includes some of the findings of that time, and the parties should have the opportunity to argue that they're defective. Given that the guidelines range, we don't believe there is absolutely for a specific defense level to bring, however, the courts are inclined to do that. The court doesn't agree, the government doesn't agree, that defense level 18 is correct based on the findings of the tort during the murder sentencing under the 2013 guidelines. In other words, you are not thinking about the same two-level increase could have been asserted on the basis of more than 10 victims, and I gather you're not interested in doing that on remand. No, Your Honor. Your Honor, we didn't argue that at sentencing, and one of the reasons is because the victims were the ones we focused on were the shareholders at Porsche and the Schneider, and it's been a long run itself, and as a result, we decided not to argue that and we're not going to contest that dispute on remand. If there are no further questions, if there are any additional questions, and if not, other than the sentencing situation, we can take our briefs and ask the court to move on. Okay, thank you. Ms. Dobbin. Thank you, Your Honor. With my remaining minutes, I'd like to address two questions that were brought to my attention by the government. One thing that the court had mentioned was the final words of Joe Kavanaugh in court, the note that left. One of the things that the court relied on was the fact that the defendant would be able to take the situation out and we would be able to cross him down the front door. Well, the government says that one of the basis for excluding that was that there was an exception to the hearsay rule that applied. You don't really make an argument in your brief about that, right? No. Well, what we argued was that the note would be inadmissible and that it was important. There were three aspects by which the court excluded it. One was concerns about the authenticity, although we submitted the values that we would be able to share. The other issue was the admissibility of it. However, 1806, we would argue, didn't go to the credibility of the witness. But also there wasn't a corroboration, because ultimately Oshimura revealed to the FBI that Joe Kavanaugh was not involved. And the third concern that the court made was we have other means by getting this evidence done. That was through cross-examination, which we were not able to do. Importantly, Joe Kavanaugh's note addresses one of the three complications that the defense wasn't able to get into, that Oshimura didn't invest in, and was all about the scheme as well. That was the issue for us. And as the court is aware, corroboration is a fundamental tool for persuasion. And the defense was not that. We were denied a complete defense, a pertinent defense, sure. But this vital evidence that we needed to get in order to prove that we were not the ones that committed this case, and if I may finish my sentence. Therefore, that's why we asked the court to reverse all conditions. Thank you. Thank you. Mr. Chen. It sounds like we don't have much of a dispute with respect to your rebate. I think that's right to keep things moving on unless we have other questions. Okay, thank you so much. That case is submitted. And so we'll have the presenters for our next argument linked in now.